IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA       :

          v.                   :          **CRIMINAL NO. 25-113**

MIA HARDY                  :

### GOVERNMENT'S SENTENCING MEMORANDUM

### I.       PRELIMINARY STATEMENT

Defendant Mia Hardy was the business office coordinator for two separate senior care facilities in Philadelphia that served elderly, infirm, and underprivileged members of our community. She abused the positions of trust she held with those facilities and stole from multiple residents whose limited funds were held by the facilities. And she did so not just once with the first senior care facility she was working for – she did it again with the second after she resigned from her job with the first facility while under internal investigation for the fraud. She exploited vulnerable residents who were hospitalized and infirm, and she exploited the families of residents who were deceased, helping herself to their funds when they could not do anything to stop her. At a minimum, she embezzled more than $151,000 in checks and cash, and she likely stole much more, as the petty cash funds she embezzled are difficult to track.

Embezzlement schemes perpetrated by insiders cause tremendous damage to victim organizations, particularly organizations that serve vulnerable members of our community. As a business manager, Hardy was entrusted to conduct herself with integrity and act in the best interests of the organizations she worked for and their residents. Hardy chose to ignore those obligations and enrich herself at the expense of those she was supposed to serve. The defendant's

criminal conduct calls for serious punishment -- within the applicable guideline range of 33-41 months in prison.

In sentencing a defendant, a court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025).[1]

At the second step of the sentencing process, "[t]he record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted). *See also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors.

---

[1] Courts previously followed a three-step process, in which the court first calculated the guideline range, then next ruled on motions for departure, before considering the 3553(a) factors. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). In an extensive amendment to the Guidelines effective November 1, 2025, the Sentencing Commission eliminated the departure provisions in the manual and dictated the two-step process described above.

II.    **BACKGROUND**

On March 20, 2025, the defendant was charged by indictment with eight counts of wire fraud, in violation of 18 U.S.C. § 1343. On September 25, 2025, the defendant pled guilty to the indictment. There was no plea agreement. During her plea colloquy, the defendant admitted to the facts set forth below.

1.    **General Background Facts**

Senior Living Facility #1 was a senior care facility located in Philadelphia, Pennsylvania in the Eastern District of Pennsylvania. It served approximately 200 senior residents, many of whom required substantial medical assistance. The residents were extremely vulnerable members of our community.

The defendant, Mia Hardy, began working for Senior Living Facility #1 in 2017 and left her employment in August 2023 while she was under investigation for the fraud in this case. She began her employment with Senior Living Facility #1 as a certified nursing assistant, and in March 2020 was promoted to the position of business office coordinator. She held this position when committing the crimes in this case until she was terminated. Hardy's job responsibilities as business office coordinator included, among other responsibilities, managing resident financial accounts and dealing with resident family members on financial matters. She held a position of trust with Senior Living Facility #1.

Senior Living Facility #2 was a senior care facility with several locations in the Philadelphia area, in the Eastern District of Pennsylvania. Hardy began working for Senior Living Facility #2 in April 2024 as the business office coordinator. She was terminated in July 2024. The facility where she worked served approximately 95 senior residents, many of whom required substantial medical assistance. The residents were extremely vulnerable members of our

community. Hardy's responsibilities with Senior Living Facility #2 were similar to her financial responsibilities with Senior Living Facility #1.

In her position as the business office coordinator with both senior living facilities, Hardy was responsible for various financial matters involving the funds of residents of the facility, including distributing personal funds to the residents at their request. Both senior living facilities allowed Hardy to exercise significant control over the funds of the residents that were in the custody of the senior living facilities.

### 2. The Fraud Scheme

From March 2020 through August 2023, Mia Hardy abused her position as the business office coordinator for Senior Living Facility #1 to divert resident funds to herself and others. She did so first, by issuing approximately 49 checks on resident accounts made payable to Hardy's family members and other associates who had no connection to the victims whose funds they received. She defrauded approximately 27 victim residents of approximately $122,941 through these misappropriated checks. She also defrauded dozens of victim residents by generating unauthorized petty cash withdrawals.

Senior Living Facility #1 disbursed funds from a resident's account in two ways. The first was through the issuance of a check to the resident or the resident's responsible party. The second method was through a petty cash disbursement in which the resident received cash when requested.

Senior Living Facility #1 used a resident fund management service ("RFMS") to help manage resident funds. RFMS is a financial service that allows a facility to open a central resident trust account, as well as a petty cash checking account and care cost checking account to receive care cost payments and petty cash reimbursement payments. Each resident had an

individual, interest-bearing sub-account within the resident trust account. To open a sub-account, each resident, or their legal representative, was required to sign an authorization agreement application that authorized Senior Living Facility #1 to assist them in making deposits and withdrawals to and from the account. Those funds were then available to the resident for personal spending or bill paying, including requests for "petty cash," or nominal amounts of cash to be used for personal spending. All of the withdrawals in this case, both with Senior Living Facility #1 and with Senior Living Facility #2 were run through the RFMS.

The RFMS system is owned and managed by a company called National Datacare, located in Chantilly, Virginia. All transactions using the RFMS are run through National Datacares servers in Virginia. While working first for Senior Living Facility #1 and then for Senior Living Facility #2, Hardy accessed the RFMS on her office computer through her unique username and password. Hardy created her unique password and after using it to access RFMS, she could issue checks or obtain petty cash from resident accounts through the RFMS.

### Fraudulent Checks – Senior Living Facility #1

In the normal course of operations at Senior Living Facility #1 when Hardy was the business office coordinator, if a resident wanted to obtain a check from their resident trust account, the resident or their legal representative would request a check from the business office, generally through Mia Hardy. Hardy would then prepare a receipt specifying the purpose and amount of the check and obtain the resident's signature. Hardy would then debit the resident's individual sub-account in the RFMS system and transfer the funds to the RFMS petty cash checking account for disbursement. The RFMS system would then generate a check which was required to be signed by a designated signatory before Hardy provided the check to the resident or payee. Checks issued in amounts over $5,000 were required to be signed by one designated

signer in the Senior Living Facility #1 facility and one designated signer from the finance department.

For Hardy or any other employee to use the RFMS system, they were required to input a username and password. The financial records of Senior Living Facility #1 showed that between March 2020 and June 2023, there were 607 total checks generated by Hardy in the RFMS system. Of those checks, at least 49 were fraudulent. Hardy issued the fraudulent checks to co-schemer payees with a traceable connection to Hardy – and unrelated to the affected resident. The co-schemers included family members and others associated with those family members. These co-schemers included known individuals identified here as A.B., A.T., F.J., H.I., I.I., J.J.W., J.W., and R.P. After receiving the checks from Hardy, the co-schemers negotiated the checks, provided a portion of the funds to Hardy, and used some of the funds for their own personal expenses. None of the funds were spent on the residents.

The fraudulent checks were drawn on 27 different resident accounts. Of those 27 accounts, 12 of them were for living residents. The remaining 15 accounts were for residents who had passed away or had been discharged. The total value of the checks resulting in actual loss was $119,449.36. There was one fraudulent check that did not clear (for $3,492.25). After the fraud was discovered, Senior Living Facility #1 reimbursed all the individual victims.

Hardy often included notations in the memo lines of the fraudulent checks to make them appear legitimate. For example, in many instances, Hardy noted in the memo line of the check that the resident's account was closed, which would occur if the resident had passed away, was transferred to another facility, or was discharged. In other instances, the memo lines noted the funds were for "personal needs" or that they were for a headstone or memorial, as if the resident had passed away. In all these instances, Hardy was concealing the true purpose of the checks

which was for her personal benefit and the benefit of her co-schemers.

The checks were all required to be signed by authorized individuals at Senior Living Facility #1. A number of the checks that Hardy misappropriated and issued to her co-schemers purported to be signed by an authorized signer. In some instances, Hardy forged the signature of that person. In other instances, Hardy obtained an authorized signature on the checks through misrepresentations to the authorized signer. Hardy engaged in the activity with these checks, and with all of the transactions discussed here, and in the indictment, fraudulently and without the knowledge or permission of Senior Living Facility #1, Senior Living Facility #2, or the affected residents.

### Petty Cash Fraud – Senior Living Facility #1

In addition to fraudulently obtaining checks on resident accounts, Hardy also stole funds from the residents by abusing the petty cash system of Senior Living Facility #1. As the business office coordinator, Hardy was responsible for disbursing petty cash to Senior Living Facility #1 residents. The cash was maintained in a safe in the business offices where Hardy worked. To obtain petty cash, a resident would make a request of Hardy, and Hardy was then required to process the request by debiting the funds from the resident's account (via the RFMS), obtaining cash from the safe, and providing the cash to the resident. Hardy was also required to prepare and maintain a written receipt showing the individual who received the cash, the amount of the advance, the purpose for the advance, the date of the transaction, and the resident's or authorized representative's signature. To access the RFMS for debiting the resident account for a petty cash transaction, Hardy needed her user identification and password, which password she created and was not available to other employees.

Hardy made numerous petty cash disbursements that were fraudulent and for her personal

benefit. She did not properly document those transactions. She made several of these disbursements from resident accounts while those residents were in the hospital or after the resident passed away. For example, from the account of resident M.A., beginning on August 16, 2022, Hardy made systematic withdrawals of cash from her account. M.A. suffered from severe cognitive impairment. There were 24 withdrawals ranging between $75 and $225. The last withdrawal was February 7, 2023, just a month before she passed away. The withdrawals totaled $3,381.11. M.A. was admitted to the hospital on January 1, 2023, and returned to the facility on January 12, 2023. There was a cash advance of $125 made on January 11 while M.A. was still in the hospital.

Similarly, from the account of resident D.B., who also suffered from severe cognitive impairment, beginning on July 14, 2022, there were 33 petty cash withdrawals totaling $3,138.65. The withdrawals occurred on a regular basis and ranged in value from $45 to $226. D.B. passed away on March 9, 2023. While she was seriously ill, there was a withdrawal on March 7, 2023, two days before she passed away. There were three additional withdrawals after she passed away, totaling approximately $275. On April 3, 2023, Hardy issued a check in the amount of $3,612,15 to close out the D.B. account. Hardy made the check payable to one of her family members.

Similarly, from the account of resident T.B., who suffered from dementia, beginning on July 14, 2022, there were 19 petty cash withdrawals totaling $1,255. The withdrawals occurred on a regular basis and ranged in value from $40 to $200. T.B. passed away on March 7, 2023. However, there were three withdrawals after she passed away, totaling $355. On April 6, 2023, Hardy issued a check in the amount of $1,378.28 to close out the T.B. account. Hardy made the check payable to one of her family members.

These are just a few examples of petty cash withdrawals that were part of this fraud scheme. Overall, records from Senior Living Facility #1 show that Mia Hardy (using her credentials) effectuated a significant number of the petty cash transactions with Hardy's username and password, and many of those transactions lacked the proper documentation.

**Fraudulent Checks – Senior Living Facility #2**

After Mia Hardy lost her job at Senior Living Facility #1 in August 2023, she was hired by Senior Living Facility #2 in April 2024. As part of her application process, she listed as references two individuals to whom she had sent fraudulent checks while at Senior Living Facility #1.

Hardy worked at Senior Living Facility #2 for approximately three months, also as the business office coordinator, until July 2024 when she was terminated for conduct unrelated to the fraud. Using the same method described above with Senior Living Facility #1, Hardy improperly generated at least four checks on Senior Living Facility #2 resident accounts through the RFMS, totaling approximately $14,061. Hardy made the checks payable to her family members and associates who then negotiated the checks for their and Hardy's benefit. Hardy also improperly obtained a blank personal check on a resident's personal Capital One bank account and issued it to one of her associates for $10,065. Hardy engaged in this activity fraudulently and without the knowledge or permission of Senior Living Facility #2 or the affected residents.

In particular, Hardy fraudulently obtained the below first three checks, which she made payable to her associates and co-schemers, via the RFMS system. Regarding the fifth check below, Hardy simply obtained the checkbook of the resident victim, stole a check, and issued it to her associate.

- Check drawn on the Senior Living Facility #2 RFMS petty cash account at TD Bank

of resident, E.Z., for $5,209.73. The check was dated June 2, 2024, and was made payable to I.I. The memo line of the check read, "TO CLOSE ACCOUNT." E.Z. had passed away one year before the check was issued. I.I. was one of the payees to whom Hardy issued checks while engaging in this fraud at Senior Living Facility #1. As noted below, in her on-the-record interview with agents, Hardy admitted to misappropriating this check.

■ Check drawn on the Senior Living Facility #2 RFMS petty cash account at TD Bank of resident, A.M., for $6,065.04. The check was dated June 7, 2024, and was made payable to S.S. The memo line of the check read, "TO CLOSE ACCOUNT." A.M. had passed away one year before the check was issued. As noted below, in her on-the-record interview with agents, Hardy admitted to misappropriating this check.

■ Check drawn on the Senior Living Facility #2 RFMS petty cash account at TD Bank of resident, M.T., for $1,911.20. The check was dated June 3, 2024, and was made payable to A.C. The memo line of the check read, "TO CLOSE ACCOUNT FOR M.T."

■ Check drawn on the Senior Living Facility #2 RFMS petty cash account at TD Bank of resident M.D. for $875.89. The check was dated June 7, 2024, and was made payable to L.L. The memo line of the check read, "TO CLOSE ACCOUNT." M.D. passed away on September 8, 2023.

■ Check drawn on the personal checking account of Senior Living Facility #2 resident, M.O., at Capital One Bank, for $10,065. The check was dated July 15, 2024, and was made payable to S.C. As noted below, in her on-the-record interview with agents, Hardy admitted to misappropriating this check.

**<u>Mia Hardy's Confession</u>**

On November 1, 2024, Mia Hardy spoke voluntarily with FBI Special Agents. Hardy initially denied wrongdoing in connection with the charged fraud scheme. After further questioning, Hardy admitted that as the business office coordinator for Senior Living Facility #1, she obtained checks drawn on resident accounts and provided them to individuals associated with her for her own personal gain. She identified specific checks that the agents showed her that she agreed she obtained unlawfully and sent to her associates. She admitted to forging the signature of an authorized representative of the facility on some of the checks and claimed that she got that representative to sign other checks by making them appear legitimate. Hardy also admitted to stealing petty cash funds on the accounts of the residents. Hardy explained that she engaged in fraud because she was having financial problems and used the stolen funds to pay personal bills.

Hardy also admitted to engaging in similar conduct at Senior Living Facility #2. She again reviewed some checks that agents showed her and admitted that she obtained them unlawfully for her personal benefit. In particular, she identified the checks listed above that were drawn on the accounts of the residents identified above. She further admitted that she saw the M.O. check book sitting on a desk and simply stole a check an made it payable to an associate of hers and signed the resident's name on the check.

Hardy concluded her statement to the FBI by saying that she knew that what she was doing was wrong and that even though she needed the money, "wrongdoing is a crime, regardless."

Hardy further admitted to causing the wires listed in the indictment as in furtherance of the scheme to defraud the two senior care facilities.

III.    **SENTENCING CALCULATION**

    A.    **Statutory Maximum Sentence.**

The Court may impose the following statutory maximum sentences: for each of Counts One through Eight (wire fraud), 20 years' imprisonment, a three-year period of supervised release, a $250,000 fine, and a $100 special assessment.

Total Maximum Sentence is: 160 years' imprisonment, a three-year period of supervised release, a $2,000,000 fine, and a $800 special assessment. Full restitution also shall be ordered. Forfeiture of all proceeds from the offenses also may be ordered.

    B.    **Sentencing Guidelines Calculation.**

The Probation Office correctly calculated the defendant's advisory guideline range as follows:

| | |
|---|---|
| Base offense level – USSG § 2B1.1(a)(1) | 7 |
| Loss more than $150,000 but less than $250,000 -- USSG § 2B1.1(b)(1)(F) | +10 |
| The offense involved more than 10 victims -- USSG § 2B1.1(2)(A)(i) | +2 |
| The victims of the offense were unusually vulnerable due to age and physical or mental condition -- USSG § 3A1.1(b)(1) | +2 |
| Abuse of a position of trust -- USSG § 3B1.3 | +2 |
| Timely acceptance of responsibility -- USSG § 3E1.1 | -3 |
| Total | 20 |

Hardy caused losses of at least **$151,350**.[2] This conservative figure includes the

---

[2] The actual loss caused by the defendant in this case was at least approximately $151,350. As pointed out in the victim impact statement from Senior Living Facility #1, there were additional petty cash dollars that were unaccounted for when Hardy was responsible for managing the funds of the residents at Senior Living Facility #1. The government agrees that Hardy likely embezzled additional funds, but it is difficult to quantify with precision because cash can be embezzled without the same paper trail that can be followed with check and electronic transfers. Because of their ages and infirmities, the victim residents were also not able to identify losses. Thus, it is difficult to separate possible paperwork discrepancies in the petty cash system from provable theft. The conservative loss figure in this case allows the Court to fashion an appropriate sentence within the applicable guidelines range as recommended by the

*continued* . . .

following: checks misappropriated from Senior Living Facility #1 plus the petty cash examples cited in the plea memo from three victims ($3,381.11 plus $1,255.00 plus $3,138.65), all together totaling $130,761.37; and checks misappropriated from Senior Living Facility #2, totaling $24,126. Thus, the loss, restitution, and forfeiture total amount is $151,350.12, with $127,224.12 going to Senior Living Facility #1 and $24,126 going to Senior Living Facility #2.

Hardy has zero criminal history points and is thus in Criminal History Category I. Thus, her guideline range is 33-41 months.

## IV.    ANALYSIS

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 569 U.S. 530, 542 (2013) (quoting *Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality opinion). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 569 U.S. at 543. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.* at 544.

In addition, this Court must also consider all of the sentencing factors set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the

---

government while also considering the victim impact statement and evidence suggesting that the defendant's embezzlement caused additional losses.

offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

### (1)    The nature and circumstances of the offense.

The nature and circumstances of Hardy's criminal conduct are serious and offensive. As set forth above, Hardy was in a position of trust with two different organizations that serve the vulnerable community of underprivileged elderly people who require the services of senior care facilities. She abused her position with those facilities to enrich herself. She did not just have a bad day, as she embezzled from those organizations repeatedly over a period of years, treating the resident funds as her personal account. She was completely undeterred after Senior Living Facility #1 became suspicious of her conduct. She simply called in sick, never came back, and got hired by Senior Living Facility #2 where she continued her embezzlement activity. She involved friends and family members in her scheme by using them to help her negotiate checks that she had misappropriated, widening the scope of her criminal activity and potentially implicating them in illegal conduct. The offense involved numerous victim residents of these facilities, dozens of whom were of limited means and lost money. She knew better than to engage in such conduct and take advantage of the vulnerable members of the community she was entrusted to serve.

The statement from an executive with Senior Living Facility #1 provided to this Court

punctuates the seriousness of the defendant's offenses and the "severe impact that Ms. Hardy's actions had on our organization, our residents and their families." He points out that the organization is a non-profit that cares for "underserved populations" and focuses on providing services "powered by a valued, highly trained team and built on decades of community trust . . . ." As part of its services, it helps manage resident fund accounts for its residents that are critical for protecting the limited funds of residents, maintaining Medicaid eligibility, and promoting "a sense of independence for the residents." Hardy's fraud impacted dozens of vulnerable residents, and when Hardy was confronted about this, she called in sick and "never came back."

> Stealing from a nursing home resident's trust account causes severe financial loss, intense emotional distress, and potential disruption of care. It strips vulnerable seniors of their personal autonomy and sense of security, leaving them unable to pay for basic daily necessities, clothing, or comfort items.

The owners of Senior Living Facility #1 also were victimized, suffering "severe financial, legal, and operational consequences." The defendant's fraud caused financial and reputational damage to the senior living facilities as government agencies and customers demand honest and reliable financial services from these companies.

The nature and circumstances of the offense warrant a within-guidelines sentence.

### (2)      The history and characteristics of the defendant.

Willie Jordan is a 59-year-old woman who, according to the PSR, had a challenging upbringing. The length of the defendant's criminal fraud activity reflects poorly on her character. This was not a momentary exercise of poor judgment. On a regular basis the defendant embezzled funds from two senior care facilities, and had she not been caught, she would likely have continued to engage in that conduct. This factor also warrants a guideline sentence.

### (3)      The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and

- 15 -

**(4)      The need to afford adequate deterrence to criminal conduct, and to
protect the public from further crimes of the defendant.**

A prison sentence within the applicable guidelines range would appropriately punish the
defendant for her criminal activity. A guidelines sentence would promote respect for the law and
deter businesspersons in positions of trust from engaging in this type of criminal activity –
especially those who work with vulnerable members of our population. Crimes like this are
difficult to detect, as evidenced by the length of time that the defendant engaged in the crimes
here, making it even more essential that the sentence deter those who might abuse their positions
of trust to engage in this type of activity.

As numerous courts have recognized, fidelity to the guidelines and imposing serious
prison sentences serve a particularly important purpose in prosecuting white-collar crime.  For
instance, the Supreme Court in *Mistretta v. United States*, 488 U.S. 361, 375 n.9 (1989), noted
that the Senate Report on the Sentencing Reform Act "gave specific examples of areas in which
prevailing sentences might be too lenient, including the treatment of major white-collar
criminals."  *Accord United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006) ("[T]he
Guidelines reflect Congress' judgment as to the appropriate national policy for [white-collar]
crimes...."); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (noting the importance
of "the minimization of discrepancies between white- and blue-collar offenses").  In *United
States v. Martin*, the Court of Appeals for the Eleventh Circuit provided the following
explanation:

> Our assessment is consistent with the views of the drafters of § 3553. As the
> legislative history of the adoption of § 3553 demonstrates, Congress viewed
> deterrence as 'particularly important in the area of white collar crime.' S.Rep. No.
> 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259. Congress was
> especially concerned that prior to the Sentencing Guidelines, '[m]ajor white collar
> criminals often [were] sentenced to small fines and little or no imprisonment.

Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.' *Id.*

455 F.3d 1227, 1240 (11th Cir. 2006).

This is especially true here. The sentence imposed must communicate to Hardy and the public that the justice system will not tolerate this type of financial misconduct. A prison sentence as recommended by the government would send the appropriate message to the community that white collar criminals who take advantage of financial systems and vulnerable members of the community will suffer serious consequences for their behavior.

> **(5)   The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

There is no need in this case to provide the defendant with educational or vocational training. Thus, this statutory factor should not affect the Court's sentencing determination.

> **(6)   The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

Considering all the facts and circumstances discussed in this memorandum, the recommended sentence would not result in any unwarranted disparities among similarly situated defendants. Courts regularly sentence defendants to sentences within the guidelines range. The recommended sentence fairly considers this defendant's conduct and the circumstances of her case, and there is no basis to conclude that a sentence within the guidelines range would result in any disparities.

> **(7)   The need to provide restitution to any victims of the offense.**

This Court need not otherwise fashion a sentence that considers the need for the defendant to pay restitution. The defendant will be ordered to pay restitution as part of her supervised release and can do so when she is released from prison.

- 17 -

## VI.    GOVERNMENT'S SENTENCING RECOMMENDATION

For all the reasons set forth above, the government requests that this Court impose a sentence within the applicable guideline range of 33 to 41 months in prison. This Court should also order restitution and forfeiture for the losses to the victims and the criminal proceeds obtained by the defendant. Such a sentence would properly account for all the sentencing factors in the context of this case, particularly the seriousness of the offense, the impact on the victims, and the need to promote respect for the law and deter others from engaging in similar illegal conduct.

Respectfully submitted,

DAVID METCALF
United States Attorney


*/s Louis D. Lappen*
LOUIS D. LAPPEN
Assistant United States Attorney

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this Sentencing Memorandum has been served on the Filing User

identified below through the Electronic Case Filing (ECF) system:


Mark Wilson
Defender Association of Philadelphia
601 Walnut St. Suite 540 West
Philadelphia, PA 19106
Mark_Wilson@fd.org


*/s Louis D. Lappen*
LOUIS D. LAPPEN
Assistant United States Attorney



DATED:  <u>July 31, 2026.</u>